**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BANK OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 09 C 5108** |
| **v.** | ) | |
| | ) | |
| **FIRST MUTUAL BANCORP OF** | ) | **JUDGE DAVID H. COAR** |
| **ILLINOIS, INC. and PETHINAIDU** | | |
| **VELUCHAMY** | | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Bank of America brings actions separately against Pethinaidu and Parameswari

Veluchamy and First Mutual Bancorp of Illinois ("First Mutual") (collectively "Defendants"),

seeking to collect overdue loan payments from Defendants. In response to Bank of America's

complaints, Defendants assert five affirmative defenses and bring virtually identical nine-count

counterclaims against Bank of America. Bank of America moves to dismiss Defendants'

counterclaims and strike their affirmative defenses. For the reasons stated below, Bank of

America's motions are GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

LaSalle Bank (now known as "Bank of America") loaned $30 million to the Veluchamys

and an additional $10 million to First Mutual, guaranteed by Pethinaidu Veluchamy ("Mr.

Veluchamy"). Because these loans are overdue, and more than $39 million owed has not been

repaid, Bank of America brings actions against both First Mutual and the Veluchamys

(collectively "Defendants") to collect the money owed. Defendants admit that they borrowed

---

[1] The following facts, taken from Bank of America's complaint and Defendants' answer and counterclaims, are
accepted as true for the purposes of deciding these motions.

and failed to pay back this money.  However, they allege that they are not obligated to do so because Bank of America committed various forms of wrongdoing, which are addressed in Defendants' nine-count counterclaims against Bank of America.

## I.      Bank of America's Loans to Defendants

Pethinaidu and Parameswari Veluchamy are the majority shareholders of First Mutual, which is a holding company for (and holds all the stock of) Mutual Bank.  Beginning in late 2005, Bank of America loaned $30 million to the Veluchamys in connection with their investment in First Mutual (the "Veluchamy Loan").  The parties' initial loan agreement, which governed this arrangement, is dated December 1, 2005.  This agreement was subsequently amended on December 28, 2006 (the first amendment), January 31, 2006 (the second amendment), and November 30, 2008 (the third amendment).  The third amendment, which was drafted in May 2009 but dated retroactively to November 30, 2008, established June 30, 2008 as the due date for the Veluchamys' loan.  Despite Bank of America's demands for repayment, the Veluchamys have only repaid about $1 million of this loan.  Bank of America filed suit on August 19, 2009 to collect approximately $29 million still owed under the parties' loan agreement.  (*Bank of America v. Pethinaidu Veluchamy and Parameswari Veluchamy*, No. 09 CV 5109.)

In February 2008, Bank of America loaned another $10 million directly to First Mutual pursuant to a loan agreement dated February 15, 2008 and amended as of November 30, 2008 (the "First Mutual Loan").  In September 2008, Mr. Veluchamy personally guaranteed this loan. Like the loan to the Veluchamys, First Mutual's loan was due on June 30, 2008 under the parties' November 30, 2008 amendment to their initial loan agreement.  Despite Bank of America's demands, none of the $10 million loaned to First Mutual has been repaid, leading

Bank of America to file suit to recover this debt on August 19, 2009.  (*Bank of America v. Pethinaidu Veluchamy and First Mutual*, No. 09 CV 5108.)

Both the Veluchamy and First Mutual loans were contributed as capital to facilitate lending at Mutual Bank, the bank wholly owned by First Mutual and controlled by the Veluchamys, First Mutual's majority shareholders.

## II.    Regas's and Mahajan's Alleged Misconduct

Defendants' counterclaims allege, in essence, that Bank of America facilitated misconduct perpetrated by Defendants' business partners, James Regas ("Regas") and Amrish Mahajan ("Mahajan"), without Defendants' knowledge.  Regas, the lead name partner of the firm, Regas, Frezados, & Dallas, LLP, served as Defendants' attorney, president of First Mutual, and a director of both First Mutual and Mutual Bank.  Mahajan served as president of Mutual Bank.

Regas negotiated the initial Veluchamy Loan Agreement.  Pursuant to this agreement, Bank of America loaned the Veluchamys a total of $20 million—$10 million on a revolving basis with a loan maturity date of November 30, 2006, and $10 million on a term basis with the term ending on November 30, 2010.  Regas advised the Veluchamys to contribute the loan proceeds to Mutual Bank, via First Mutual, as capital to facilitate Mutual Bank's lending, and Bank of America knew that the loan proceeds would be used in this manner.

In 2005, Mutual Bank's assets increased by approximately $500 million primarily due to the bank's extension of commercial real estate loans.  Both Regas and Mahajan stood to gain significantly from Mutual Bank's growth.  Regas benefited because his firm "generated outsized fees" through work related to Mutual Bank's extension of loans, and the firm channeled a

substantial portion of those fees directly to him. (Counterclaim ¶ 9.[2]) Mahajan benefited as well because his employment agreement provided that he would receive a bonus if the bank's return on assets reached a certain point. In 2005, Mahajan's bonus increased by more than 60 percent, resulting in a $300,000 bonus in addition to his annual salary of $200,000. Regas and Mahajan benefited further as Mutual Bank's assets continued to grow in 2006. Mahajan's bonus increased to $610,000, and Regas's law firm continued to generate (and direct to Regas) sizeable fees from work related to Mutual Bank's extension of loans.[3]

On December 28, 2006, Regas negotiated with Bank of America on Defendants' behalf to amend the Veluchamy loan agreement. The amendment, effective November 30, 2006, increased the maximum amount available on the revolving loan from $10 million to $20 million and extended the loan's maturity date to November 30, 2007. The capital available under the revolving loan (and unaltered term loan) continued to facilitate lending by Mutual Bank.

In approximately August 2007, Mutual Bank commenced a precarious course of expansion that, according to Defendants, ultimately precipitated the bank's downfall. Under the direction of Mahajan, and with the aid of Regas and his law firm, Mutual Bank initiated a substantial expansion of its loan portfolio that increased the bank's assets by a third (roughly $450 million) by taking on about 30 additional commercial real estate loans. These loans (the "Brokered Loans") were primarily for properties in the New York/New Jersey area and were brokered by Harry Shah ("Shah") and an affiliated entity named Prime Time.

Regas and Mahajan made a series of misrepresentations to the Veluchamys, other shareholders of First Mutual, and the board of directors of Mutual Bank regarding the nature of

[2] Defendants' answer and counterclaims to each of Bank of America's suits are identical. Unless otherwise noted, the Court cites to the record in the *Veluchamy* case, No. 09-CV-5109.
[3] Defendants also allege that Mahajan and/or his wife had borrowed a substantial amount of money from another bank of which Regas was the majority owner, and Regas thus had an incentive to facilitate Mahajan receiving additional compensation with which to pay the principal and interest on such borrowings.

the Brokered Loans. Regas and Mahajan represented, for example, that the New York/New Jersey area, where the properties underlying most of the Brokered Loans were situated, was "the place to be" for such loans, and thus the bank could confidently expect payment on those loans. (*Id.* ¶ 15.) Regas, a banking attorney, experienced banker, and majority owner of his own bank, pushed the Mutual Bank board to approve the Brokered Loans, stating that the board would be "passing up a great deal" for the bank if it refused to do so. (*Id.*)

In fact, the Brokered Loans were not a "great deal" for Mutual Bank. Mutual Bank discovered later that the appraisals on which various of the loans were based were overstated, forcing the bank to write down the loans. Shah, who exercised an unusual amount of control over the appraisals, at various times chose and directed the appraiser. Since the size of each loan corresponded with the property appraisal, and the fee received by Shah and Prime Time amounted to a percentage of the loan, Shah and Prime Time had incentives to secure overstated appraisals. Regas and Mahajan knew or should have known as much, but they failed to disclose this information to the Veluchamys or First Mutual. Ultimately, Shah received more than $1 million in fees on the Brokered Loans, and his brokerage separately received more than $2 million in fees.

Regas and Mahajan made several other misrepresentations regarding the Brokered Loans. With respect to loans made in connection with the Shubh Hotels Boca and Shubh Hotels Detroit, Mahajan represented that the Boca hotel was a Sheraton in good condition, when in fact the hotel had lost its Sheraton flag and was in poor condition. Additionally, when Mahajan was asked prior to approval whether the principals named in connection with the loans were husband and wife, he falsely stated that they were not. Shortly after the Boca loan was approved and closed, $1.5 million in loan proceeds were advanced for the stated purpose of buying steel for a hotel

expansion.  However, the steel was never purchased, and the proceeds were apparently used for something else.  Ultimately, Mutual Bank had to write off more than $14 million on the Shubh loans.

In addition to mischaracterizing the attractiveness of the Brokered Loans, Regas and Majahan misrepresented the suspicious process by which the Brokered Loans were approved and closed.  While loans of this nature usually take between 30 and 60 days to close post-approval, most of the Brokered Loans advanced from approval to closing in less than one week.  Indeed, only four of the Brokered Loans closed more than 30 days after they were approved.  Mahajan and Regas knew or should have known that this accelerated process decreased the likelihood that problems with the loans, such as overstated appraisals, would be flagged.  Although they knew about the Brokered Loans' accelerated progression from approval to closing, Mahajan and Regas did not share this information with the Veluchamys, First Mutual, or the Mutual Bank board.  Additionally, although Mutual Bank normally required the management loan committee to vet such loans before they were presented to the bank's board for final approval, most of the Brokered Loans brought before the board had bypassed the management loan committee, and some had even been rejected by the loan committee.  Regas and Mahajan did not disclose this information to the Veluchamys, First Mutual, or the Mutual Bank board.  Rather, they affirmatively gave the impression that the loans had in fact been vetted and approved by the loan committee.

The Brokered Loans allowed Mutual Bank to "book" about $9.4 million in fees and garnered "unusually high legal fees" for Regas's law firm, which benefited Regas personally.  (Counterclaim ¶¶ 13-14.)  In addition, as Mahajan pushed the Brokered Loans through, his salary

increased in lock step with Mutual Bank's stated assets. Mahajan's total compensation in 2007, including his bonus, amounted to more than $1.6 million, over double his compensation in 2006.

### III.        Defendants' Additional Loans

In early 2008, in the midst of pushing through the Brokered Loans, Regas and Mahajan prevailed upon the Veluchamys and First Mutual to funnel additional capital into Mutual Bank to facilitate lending. As a result, with the aid of Regas, the maturity date on the revolving loan under the Veluchamy Loan Agreement was extended to November 30, 2008. The amount of the term loan, which did not mature until November 2010, was decreased to $9 million to reflect a $1 million paydown of that loan by the Veluchamys. Due to Regas's and Mahajan's pressure to put additional capital into Mutual Bank, First Mutual took out a $10 million revolving loan from Bank of America in February 2008. Regas negotiated and documented the loan agreement governing this loan, and Mahajan, as secretary of First Mutual, signed it. As Bank of America knew, the proceeds of this loan were to be—and were—used to facilitate lending by Mutual Bank. In approximately April 2008, when Regas and Mahajan learned that $10 million of the $20 million available under the Veluchamys' revolving loan had yet to be drawn upon, they pressured the Veluchamys to borrow the remaining $10 million, and the Veluchamys complied. As Bank of America knew, the proceeds of this loan would also be applied to facilitate lending by Mutual Bank.

By the time the Veluchamys borrowed the remaining $10 million available under their revolving loan, Bank of America knew that Mutual Bank was in the process of substantially increasing its commercial real estate loan exposure, while Bank of America was reducing its own exposure on such loans. Defendants allege that the Veluchamys' borrowing of this additional $10 million assuaged any of Bank of America's concerns, benefited Bank of America by

strengthening Mutual Bank's financial position, and decreased the risk that First Mutual would default on the $10 million loan previously provided by Bank of America. Additionally, Bank of America believed that the Veluchamys, and Mr. Veluchamy in particular, who had built a successful line of other businesses, were wealthy individuals capable of paying off their loans regardless of what occurred at Mutual Bank.

As 2008 progressed, Bank of America became increasingly concerned about Mutual Bank. According to Mutual Bank's call reports for the first two quarters of 2008, Mutual Bank continued to take on new commercial real estate loans, amounting to $292 million, at a time when Bank of America was reducing its own exposure on such loans. Indeed, while Mutual Bank was taking on Brokered Loans at par from other lenders, Bank of America was offloading such loans at below par and writing off the difference. Mutual Bank's call reports also provided direct information about the bank's deteriorating financial condition. They indicated, for example, that Mutual Bank's noncurrent loans and leases reached $115 million by the end of the second quarter of 2008, which amounted to triple their total the year before.

By about September 2008, Mutual Bank's loan portfolio had begun to deteriorate. The bank's regulatory capital classification declined from "well capitalized" to "adequately capitalized," limiting the bank's ability to renew, accept, and maintain certain deposits. In order to remove this limitation and sustain Mutual Bank's viability, the bank had to bring in additional regulatory capital in the form of subordinated notes. Based on a provision in its loan agreement with Bank of America, Mutual Bank required Bank of America's consent to take on such additional indebtedness. When approached, Bank of America agreed to consent to the issuance of subordinated notes on the condition that Mr. Veluchamy personally guaranty the $10 million First Mutual Loan Agreement. On approximately September 26, 2008, Mr. Veluchamy signed

the guaranty required by Bank of America.  At the same time, Bank of America learned that Mr. Veluchamy was contemplating purchasing $17 million of the subordinated notes and guaranteeing another $5 million in subordinated notes to be purchased by other investors. Defendants allege that, from Bank of America's perspective, Mr. Veluchamy's purchase and purported guaranty of the subordinated notes reduced the risk that First Mutual or the Veluchamys would default on Bank of America's higher ranking loans.

It is at this point in their counterclaim that Defendants allege wrongdoing on the part of Bank of America.  According to Defendants, Bank of America knew that Regas and Mahajan were misappropriating (or allowing the misappropriation of) the proceeds of the First Mutual and Veluchamy loans in order to facilitate the Brokered Loans.  Bank of America apparently acquired this knowledge through its awareness that Mutual Bank was taking on Brokered Loans at a time when Bank of America was exiting the market for such loans.  Forming the crux of Defendants' complaint, Bank of America allegedly failed to disclose this information to the Veluchamys either in April 2008 (when the Veluchamys borrowed the remaining $10 million available under their revolving loan) or in September 2008 (when Mr. Veluchamy personally guaranteed the First Mutual loan, purchased $17 million of Mutual Bank's subordinated notes, and guaranteed another $5 million purchase of subordinated notes by other investors).

In a meeting with Arun Veluchamy, the Veluchamys' son and a director of Mutual Bank, Bank of America apparently revealed its knowledge that the proceeds of the Veluchamy and First Mutual loans were being misused.  During this meeting, which occurred in approximately October or November 2008, Jeff Bowden, a Bank of America banker responsible for the Veluchamy and First Mutual relationships, disclosed to Arun Veluchamy that: (1) Bank of America "had, for some time, known of problems with respect to Mutual Bank;" (2) he and Bank

of America "were not surprised by Mutual Bank's then-deteriorating financial situation, since Mutual's 'numbers' had for some time been 'way off' and 'did not make sense;'" and (3) he knew that "there had been problems with management at Mutual Bank, which he said the Veluchamys would soon see as they looked further into the situation at the bank." (Counterclaim ¶ 29.)  The Veluchamys claim that, had Bank of America shared this information with them previously, they would not have borrowed the remaining $10 million available under their revolving loan, entered into the $10 million First Mutual Loan Agreement, guaranteed the First Mutual Loan Agreement, or invested in and guaranteed the subordinated notes.

### IV. Loan Amendments: Defendants' Release and Bank of America's Forbearance

When Defendants' financial condition continued to deteriorate, they were unable to repay their loans by the November 30, 2008 due date.   In May 2009, Defendants and Bank of America amended their loan agreements to provide for, *inter alia*, Bank of America's forbearance and Defendants' "release and covenant not to sue" Bank of America.  (*Veluchamy* Compl., Ex. A-Part IV; *First Mutual* Compl., Ex. A-Part II.)  At the time that this agreement was signed, approximately $30 million in indebtedness was nearly six months past due.  (*Veluchamy* Compl., Ex. A-Part III at 1; *First Mutual* Compl., Ex. A-Part I at 4) (indicating that the maturity date for the Veluchamys' $20 million revolving loan and First Mutual's $10 million loan was November 30, 2008).  According to this agreement, the Veluchamys "requested a forbearance to and through June 30, 2009 in [Bank of America's] exercise of its rights and remedies," and Bank of America was "willing to forbear until June 30, 2009" from exercising any of the rights, powers and remedies available to it in the event of Defendants' default.  (*Veluchamy* Compl., Ex. A-Part IV at 3; *First Mutual* Compl., Ex. A-Part II at 3.)  Additionally, Bank of America modified its right to immediately declare Defendants in default, and among other things, to immediately

recover default rate interest. (*Veluchamy* Compl., Ex. A-Part I at 8-9; *First Mutual* Compl., Ex. A-Part I at 7).

As partial consideration for Bank of America's forbearance, Defendants explicitly reaffirmed the validity and enforceability of their indebtedness (*see Veluchamy* Compl., Ex. A-Part IV at 4; *First Mutual* Compl., Ex. A-Part II at 4.) and signed a "release and covenant not to sue." (*Veluchamy* Compl. Ex. A-Part IV at 10; *First Mutual* Compl., Ex. A-Part II at 6-7.). This provision states specifically:

> Release and Covenant Not to Sue.  In consideration of the agreements and understandings in this Agreement, each Borrower . . . hereby knowingly and voluntarily, unconditionally and irrevocably, absolutely, finally and forever releases, acquits and discharges each Bank Released Party[4] . . . from any Claim relating in any manner whatsoever to any of the Loan Documents, including any transaction contemplated thereby or undertaken therewith, or otherwise relating to such Borrower's credit relationship with [Bank of America] at any time on or prior to the Amendment Effective Date, including relating or purportedly relating to any manner whatsoever to any facts, known or unknown, in existence on or any time prior to the Amendment Effective Date (each a "Borrower-Related Claim").

> Each Borrower hereby knowingly and voluntarily, unconditionally and irrevocably, absolutely, finally and forever covenants that he or she shall refrain . . . from commencing or otherwise prosecuting any action, suit or other proceeding of any kind, nature, character, or description, including in law or in equity, against any Bank Released Party on account of any Borrower-Related Claim.

(*Veluchamy* Compl. Ex. A-Part IV at 6; *First Mutual* Compl., Ex. A-Part II at 6-7.)  Although the amendments to Defendants' loan agreements were signed in May 2009, they applied retroactively as of November 30, 2008.  (*Veluchamy* Compl. Ex. A-Part IV at 1; *First Mutual* Compl., Ex. A-Part II at 1.)

Defendants claim that these loan amendments are void due to the circumstances that led Defendants to sign them.  According to Defendants, Bank of America "used [Mutual Bank's] deteriorating financial situation, which it had a significant role in creating, first to claim,

---

[4] Bank Released Party means Bank of America and all related entities.  (*Veluchamy* Compl., Ex. A-Part IV at 7; *First Mutual* Compl., Ex. A-Part II at 7.)

pretextually and in bad faith, that First Mutual and the Veluchamys were in default under the loan agreements; and then to work to extract, via duress and unfair dealing" the retroactive amendments to these agreements. (Counterclaim ¶ 31.) To make matters worse, Defendants claim, Bank of America became privy to confidential information belonging to Defendants during the course of the parties' negotiations, and Bank of America used this information to gain an improper advantage over them. Specifically, in connection with these amendments, Defendants were represented by a lawyer from a firm that had an ongoing relationship with Bank of America. After failing to obtain a conflicts waiver from them, Defendants' lawyer gained access to "information regarding Mutual Bank's further deteriorating state and the pressures that financial state put upon the bargaining position of the Veluchamys and First Mutual." (*Id.*) That information, apparently imputed to Bank of America, armed Bank of America with "the luxury of being inflexible with First Mutual and the Veluchamys." (*Id.*) Defendants claim that, if they had not assented to the loan amendments, "their ongoing efforts to secure capital for Mutual Bank would have precipitously failed, as would have the bank, taking with it the tens of millions of dollars that First Mutual and its shareholders including the Veluchamys, had invested therein." (*Id.*)

Ultimately, as the loans procured by Regas and Mahajan continued to deteriorate, so too did Mutual Bank. In late July 2009, the Federal Deposit Insurance Corporation placed Mutual Bank into receivership, and the Veluchamys and First Mutual lost the ability to repay their loans to Bank of America. On August 4, 2009, Bank of America sent the Veluchamys and First Mutual demands for payment of their past-due loans. Defendants fault Bank of America for doing so, claiming that Bank of America requested payment in bad faith since it knew, or had

reason to know, that Regas and Mahajan used the proceeds of the Veluchamy and First Mutual Loans "to facilitate the very type of lending that helped drag Mutual down." (*Id.* ¶ 32.)

V.     **Defendants' Counterclaim**

Defendants' allegations culminate in nine counterclaims: (1) Negligence; (2) Negligent Misrepresentation; (3) Aiding and Abetting Fiduciary Breach; (4) Aiding and Abetting Fraud; (5) Fraud; (6) Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; (7) Breach of Fiduciary Duty; (8) Breach of Contract; and (9) Unjust Enrichment. Additionally, Defendants assert five affirmative defenses: Unclean Hands, Fraud, Duress, Estoppel, and Failure to Mitigate.

## LEGAL STANDARD

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court accepts all well-pleaded allegations in the plaintiff's complaint as true and draws all possible inferences in favor of the plaintiff. Fed. R. Civ. P. 12(b)(6); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). To survive a Rule 12(b)(6) motion to dismiss, a complaint must comply with Fed. R. Civ. P. 8(a) by providing a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted). The complaint must "state a claim that is plausible on its face," *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007), which means that it demonstrates "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1949. The plaintiff's factual allegations need not be "detailed," but they must include more than "labels and conclusions" in order to "give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47(1957)) (internal quotation marks omitted).

## DISCUSSION

Bank of America moves to dismiss all of Defendants' counterclaims on the basis of their "release and covenant not to sue" Bank of America for reasons relating to the parties' credit relationship. As Bank of America correctly points out, courts routinely enforce such releases. *See, e.g.*, *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984) (affirming dismissal of defendant's counterclaims where defendant had executed a "comprehensive" release encompassing "any and all claims, demands, damages, actions, causes of action or suits of any kind or nature" against plaintiff); *Hurd v. Wildman, Allen and Dixon*, 707 N.E.2d 609, 616 (Ill. App. 1999) (affirming dismissal where plaintiff executed a release agreeing to "unconditionally and forever release, acquit, and discharge the [defendant] from *any and all* claims, demands, liabilities, and causes of action") (emphasis in original). Here, Defendants signed releases related to both the Veluchamy and First Mutual loans. These releases provided specifically that each Defendant "unconditionally and irrevocably . . . releases, acquits and discharges [Bank of America] . . . from any Claim relating in any manner whatsoever to any of the Loan Documents . . . or otherwise relating to such Borrower's credit relationship with [Bank of America] at any time on or prior to [November 30, 2008]" and "unconditionally and irrevocably, absolutely, finally and forever covenants" not to file suit on any released claim. (*Veluchamy* Compl. Ex. A-Part IV at 6; *First Mutual* Compl., Ex. A-Part II at 6-7.) Because Defendants' counterclaims allege misconduct perpetrated by Bank of America no later than September 2008, Bank of America argues that Defendants' counterclaims are barred by the clear terms of their releases.

Defendants do not dispute that they signed the releases at issue. Rather, they claim that their releases are void because Bank of America procured them by improper means. When a motion to dismiss is based on a release that is valid on its face, "then the burden shifts to the

[non-moving party] to sufficiently allege and prove that a material issue of fact exists which would invalidate the agreement." *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 764 (Ill. App. 2003) (citation and quotation marks omitted).  To that end, Defendants must allege and prove that "there has been fraud, duress, mutual mistake, or, at least in some cases, unconscionability." *Id.* (quoting *Carlile v. Snap-On Tools*, 648 N.E.2d 317, 322 (Ill. App. 1995)) (internal quotation marks omitted).  Defendants assert defenses of fraud and duress to their releases, alleging two underlying forms of wrongdoing: (1) Bank of America acquired (and exploited) confidential information about Defendants' bargaining position through Defendants' lawyer, whose firm maintained an ongoing relationship with Bank of America; and (2) Bank of America "played a significant role" in causing Mutual Bank's financial decline and took advantage of Mutual Bank's resulting vulnerability.  (Defs' Resp. to Pl.'s Mot. to Dismiss at 3.) The Court will consider each of Defendants' arguments in turn.

I.      **Alleged Attorney Conflict**

Defendants first attempt to repudiate their releases by arguing that a conflicted lawyer represented them when they agreed to these releases.  According to Defendants, unbeknownst to them, their lawyer's firm maintained an ongoing relationship with Bank of America.  Since an attorney's knowledge is imputed to his entire firm, Defendants contend that confidential information about their negotiating position traveled from their attorney, to his firm, and ultimately to Bank of America.  Defendants argue that Bank of America's access to information concerning Defendants' vulnerable financial position endowed Bank of America with the "luxury of being inflexible" with Defendants during negotiations and enabled Bank of America's extraction of the releases at issue.  (Counterclaim ¶ 31.)  Accepting these allegations as true, Defendants' argument fails for a number of reasons.

Defendants do not cite (nor can the Court unearth) any case that stands for the proposition that an attorney conflict vitiates a release signed under the circumstances alleged here. Two implications flow from Defendants' conflict argument. The first is that their lawyer acted disloyally or rendered bad advice. Defendants make no such allegation, and even if they did, their recourse would be against their lawyer, not Bank of America. The second implication—and the one that particularly concerns Defendants—is that Bank of America acquired, and then concealed, information about the depths of Mutual Bank's financial vulnerability. However, this is not grounds to invalidate Defendants' releases, and Defendants cite no authority to the contrary. Regardless of what Bank of America learned from Defendants' attorney, Mutual Bank's financial decline was no secret. When the parties entered into the forbearance and release agreements at issue, Defendants were already nearly six months in default in paying off their loans. If that was not enough to expose Defendants' financial strain, Mutual Bank's financial problems appear on the face of these agreements, which cite, among other problems, Mutual Bank's drop below "well capitalized" in its regulatory capital classification. Not to mention, Defendants admit to knowing what Bank of America allegedly concealed—that Mutual Bank suffered financial problems—and Defendants cite no authority for the proposition that one party must disclose information that the other already knows. *Cf. Continental Bank, N.A. v. Everett*, 964 F.2d 701, 704 (7th Cir. 1992) ("parties to arms' length negotiations need not open their files to each other.").

These problems aside, Defendants' conflict argument does not fit within any of the relevant defenses available to void a release—fraud, duress, mutual mistake, or unconsionability. *See Thorwood*, 799 N.E.2d at 764. To the extent that Defendants allege fraud in connection with their attorney's purported conflict, this argument must fail. Although fraud conventionally

involves affirmative misrepresentations, fraud may "consist of the intentional omission or concealment of a material fact under circumstances creating an opportunity and duty to speak." *Janowiak v. Tiesi*, No. 1-09-1273, 2010 WL 1854144, at *6 (Ill. App. May 7, 2010) (quoting *Thornwood*, 799 N.E.2d at 765) (internal quotation marks omitted.) "In order to prove fraud by the intentional concealment of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak." *Thornwood*, 799 N.E.2d at 765 (quoting *First Midwest Bank N.A. v. Sparks*, 682 N.E.2d 373 (Ill. App.1997)) (internal quotation marks omitted). Defendants shoulder the burden of proving that such a relationship exists. *See Schrager v. North Community Bank*, 767 N.E.2d 376, 385 (Ill. App. 2002). Where, as here, a fiduciary relationship does not exist as a matter of law, "facts from which a fiduciary relationship arises must be pleaded and proved by clear and convincing evidence." *Id.* (quoting *Magna Bank of Madison County v. Jameson*, 604 N.E.2d 541, 544 (Ill. App. 1992)) (internal quotation marks omitted). To establish a fiduciary relationship, Defendants must demonstrate that they "placed trust and confidence" in Bank of America, affording Bank of America "influence and superiority" over Defendants. *Magna Bank*, 604 N.E.2d at 544. Such "trust and confidence can be established by the following factors: degree of kinship, age disparity, health, mental condition, education, business experience between the parties, and the extent of reliance." *Id.*

Defendants, here, fail to establish the existence of a fiduciary relationship between themselves and Bank of America. They do not allege, as they must, that they placed any special trust in Bank of America that elevated Bank of America to a position of superiority. *See Magna Bank*, 604 N.E.2d at 544; *see also Graham v. Midland Mortgage Co.*, 406. F.Supp.2d 948, 953 (N.D. Ill. 2005) (dismissing fiduciary duty claim where plaintiff failed to allege that he placed special trust or reliance on defendants). Indeed, their allegations show that the opposite is true.

Defendants are sophisticated parties who own a bank and a successful line of other business. That they obtained (and were represented by) counsel throughout the course of their relationship with Bank of America negates any inference that they especially trusted Bank of America. Ultimately, Defendants fail to establish a fiduciary relationship giving rise to a duty to speak on Bank of America's part, thus defeating their claim that Bank of America engaged in fraud by concealing confidential information acquired through Defendants' attorney. To the extent that Defendants argue that their attorney's alleged conflict (or the consequences of this alleged conflict) supports a duress defense, the Court addresses this argument below.

## II. Defendants' Economic Duress Claim

Defendants next claim that their releases are unenforceable because they were signed under duress. Under Illinois law, economic duress exists "where one is induced by a wrongful act or threat of another to make a contract under circumstances that deprive one of the exercise of one's own free will." *Hurd*, 707 N.E.2d at 614. That is, Defendants must establish that Bank of America's wrongful acts left them "bereft of the quality of mind essential to the making of a contract." *Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1342-43 (7th Cir. 1992) (citations and quotation marks omitted). "Acts or threats cannot constitute duress unless they are wrongful, but the term 'wrongful' extends to acts that are wrongful in a moral sense, as well as acts which are criminal, tortious, or in violation of contract duty." *Carlile*, 648 N.E.2d at 322. Furthermore, "[d]uress cannot be predicated upon a demand which is lawful or upon doing or threatening to do that which a party has a legal right to do." *J.D. Alexander v. Standard Oil Co.*, 423 N.E.2d 578, 582 (Ill. App. 1981). Nor is there duress "where consent to an agreement is secured merely because of hard bargaining positions or financial pressures." *Hurd*, 707 N.E.2d at 614. "Rather, the conduct of the party obtaining the advantage must be

manifestly tainted with some degree of fraud or wrongdoing in order to invalidate an agreement on the basis of duress." *Carlile*, 648 N.E.2d at 322.

To support their duress defense, Defendants argue that Bank of America "played a significant role" in causing Mutual Bank's decline and then took advantage of Defendants' vulnerability by procuring the releases at issue. (Defs' Resp. to Pl.'s Mot. to Dismiss at 3.) Importantly, the "mere stress of business conditions" faced by the party claiming duress "will not constitute duress where the [other party] was not responsible for the conditions." *Selmer Co. v. Blakeslee-Midwest Co.*, 704 F.2d 924, 928 (7th Cir. 1983) (citation and quotation marks omitted) (applying Wisconsin law); *see also Resolution Trust Co. v. Ruggiero*, 977 F.2d 309, 314 (7th Cir. 1992) (applying *Selmer* to an Illinois case and stating that "A borrower cannot charge a lender with economic duress where the pressures on the borrower are the result of his own business decisions and economic conditions."). Defendants simply cannot demonstrate that Bank of America is "responsible" for their financial decline. To the contrary, they assert that their own business partners, Regas and Mahajan, proximately caused—and therefore are responsible for— the financial vulnerability Defendants were suffering when they signed the releases at issue. *See Selmer*, 704 F.2d at 928-29 (rejecting economic duress defense where one party may have contributed to, but did not proximately cause, the other's financial vulnerability).

Despite Defendants' sweeping claim that Bank of America "played a significant role" in precipitating Mutual Bank's demise, the only facts alleged to support this claim are that Bank of America knew that Defendants' business partners were defrauding them and, without disclosing this information, permitted Defendants to increase their indebtedness. (Specifically, Bank of America allowed Defendants to draw on their already existing line of credit, take out an additional loan, personally guaranty that loan, and purchase and guaranty subordinated notes.)

Bank of America's allegedly wrongful conduct pales in comparison with the fraud committed by Defendants' own business partners. As Bank of America persuasively argues, under no circumstances could Bank of America have been more of a cause of Mutual Bank's downfall than were Defendants themselves, given that Bank of America merely lent money to Defendants, whereas Defendants were accountable for the bank's operations. (Pl. Reply Br. at 3.) Because Defendants' allegations permit no possible inference that Bank of America is "responsible" for their financial vulnerability, Defendants are bound by the general rule that duress does not exist where a party consents to an agreement merely because of the financial pressures it faces. *See Hurd*, 707 N.E.2d at 614.

To the extent that Defendants attempt to skirt this rule by arguing that Bank of America's conduct was "manifestly tainted with some degree of fraud or wrongdoing," this effort fails as well. *Carlile*, 648 N.E.2d at 322. As explained above, Bank of America did not commit fraud in connection with Defendants' attorney's alleged conflict of interest, and Defendants are unable to establish that this type of "wrongdoing" supports a duress defense. Furthermore, Defendants cannot invoke a duress defense based on "fraud or wrongdoing" in connection with Bank of America's alleged concealment of Defendants' business partners' misappropriation of loan proceeds. Assuming that Bank of America was indeed aware of such fraud, for the reasons already discussed, Bank of America had no duty to reveal this information to Defendants. *See Janowiak v. Tiesi*, 2010 WL 1854144, at *6 (fraud by omission requires "circumstances creating an opportunity and duty to speak"). In sum, Defendants fail to allege any wrongful conduct of the nature sufficient to support a duress defense. Although Defendants' inability to satisfy this requirement provides adequate grounds for the Court's rejection of their duress defense, Defendants are also unlikely to succeed in demonstrating that they were "bereft of the quality of

mind essential to the making of a contract." *Havoco*, 971 F.2d at 1342-43 (citations and quotation marks omitted). While this is typically a question of fact, *see Carlile*, 648 N.E.2d at 323, it is worth nothing that a claim of duress can be rebutted when the claimant has "retained the benefits of other provisions of the agreement" entered under duress. *J.D. Alexander*, 423 N.E.2d at 583. Here, in exchange for Defendants' releases, Bank of America provided them with seven months' forbearance, a benefit that Defendants requested and desperately needed. Defendants' present attempt to denounce the consideration *they* requested is unavailing.

Because Defendants fail to establish that their releases are void on the grounds of fraud or duress, the Court must enforce these releases to bar all nine of Defendants' counterclaims. Accordingly, Bank of America's motions to dismiss Defendants' counterclaims are GRANTED.

With respect to Bank of America's motions to strike Defendants' affirmative defenses, the affirmative defenses of unclean hands, fraud, and duress fail for the same reasons that Defendants' counterclaims fail. These affirmative defenses are stricken. Although Defendants' other affirmative defenses (estoppel and failure to mitigate) are weakened by this Court's rejection of Defendants' counterclaims, these defenses are not stricken.

## CONCLUSION

For the reasons stated above, Bank of America's motions to dismiss Defendants' Counterclaims and strike Defendants' affirmative defenses are GRANTED IN PART and DENIED IN PART.

Enter:
/s/ David H. Coar

_____
David H. Coar
United States District Judge

**Dated:** July 1, 2010